PTH:CWE
F. #2021R00379

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A RED APPLE iPHONE 11, CURRENTLY LOCATED WITH FEDERAL AUTHORITIES IN THE EASTERN DISTRICT OF NEW YORK | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 21 MJ 656 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, MATTHEW RIZZO, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in the possession of law enforcement, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), assigned to Border Enforcement Security Task Force, and I have been employed by HSI since approximately May 2019. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have received training and participated in investigations regarding, among other things, the trafficking and importation of narcotics and unlawful drug trafficking, and have gained knowledge and expertise in the collection and identification of drug evidence. I have participated in multiple investigations with HSI, and have

participated in the execution of search warrants involving electronic evidence of the type requested here.

3. This affidavit is based on my personal knowledge, my review of documents and other evidence, conversations with other law enforcement personnel, and my training and experience. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is a red Apple iPhone 11, belonging to Elijah Jamir Davis (the "Defendant"), hereinafter the "DEVICE." The DEVICE is currently in HSI's possession within the Eastern District of New York. On May 21, 2021, the Defendant gave HSI consent to search the DEVICE.

5. The applied-for warrant would authorize the forensic examination of the DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. As described in more detail below, on May 21, 2021, the Defendant was arrested at John F. Kennedy International Airport ("JFK"), while in possession of approximately 4,300 grams of cocaine, a "Canik" brand handgun along with forty 9mm rounds in a hard case box and marijuana, all located on and within the Defendant's luggage. Based on the below, there is probable cause to believe the Defendant violated Title 21, United States Code, Sections 952(a) and 960(a)(1) (importation of controlled substances), Title 21, United States Code, Section 963 (conspiracy to import controlled substances), Title 21, United States Code, Section 841(a)(1) (distribution and possession with intent to distribute controlled substances) and Title 21, United

States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Subject Crimes") and that there is evidence of the Subject Crimes on the DEVICE. I have been informed by officers from the United States Customs and Border Patrol ("CBP") of the following facts.

7. On or about May 21, 2021, the Defendant arrived at Terminal 5 of JFK in Queens, New York aboard JetBlue flight B6380 from Jamaica.

8. As the Defendant passed through Immigration and Customs, CBP officers referred the Defendant for a random law enforcement examination. The CBP officer conducting the examination observed that the Defendant was in possession of a large black roller suitcase that had been checked in during the flight and small black roller suitcase that had been a carry-on bag.

9. As a part of the examination, the CBP officer asked the Defendant a series of routine questions regarding his travel to the United States, and specifically about whom he had been traveling with during his most recent trip. The Defendant said that he traveled with friends and they were returning from their trip to Jamaica. In response to a question about the location of his friends, the Defendant said that he did not know where his friends were and stated he was not sure if they were still waiting for bags or if they had left the inspection area.

10. The CBP officer proceeded to inspect the Defendant's luggage. Upon inspection of the Defendant's large suitcase, the CBP officer noticed that it contained a black Canik brand box. The CBP officer asked if there was a firearm in the box and the Defendant replied "yes" and stated that he traveled with his personal gun. The Defendant stated that he informed JetBlue that he was flying with his handgun but did not provide any paperwork confirming this account.

11. Upon opening the box, the CBP officer found a Canik #TP9sf 9mm firearm with an empty magazine and a smaller box of "Superx" Winchester brand 9mm ammunition.

12. Next, the CBP officer examined the smaller black roller suitcase. After emptying the bag of its contents, the CBP officer noticed the bag was still unusually heavy. In order to figure out the reason for the bag's unusually heavy weight despite the contents being removed, the CBP officer took the bag to an inspection area so it could go through an X-Ray machine.

13. The X-Ray imaging revealed that there was a peculiar square panel on the side of the bag that did not appear to be a standard part of the structure of the bag itself. The CBP officer inspected the side of the bag where the X-Ray revealed the square panel by probing it and found a package wrapped in plastic.

14. While probing the small package, the CBP officer asked the passenger when he purchased the bag and the Defendant said he had bought it roughly a month ago (the Defendant later said to HSI agents that he was given the smaller bag by an unknown individual to take with him on the flight but did not know to whom he was supposed to give the bag). As the CBP officer further examined the bag he found two additional packages and removed them.

15. The CBP officer also noticed that within the large black roller suitcase there was a black laptop bag. As a part of the examination, the CBP officer removed the laptop and laptop bag from the black roller bag and probed the sides of the laptop bag. Upon noticing an abnormal object within the lining of the laptop bag, the CBP officer cut open the sides of it, revealing two additional packages.

16. A total of five vacuum sealed packages containing a white powdery substance were seized from the Defendant's bags. One of the packages was probed and tested with a GEMINI analyzer. The substance tested positive for cocaine.

17. The Defendant was placed under arrest for the importation of narcotics into the United States. The large roller suitcase was rechecked in a private search room and a small bag of a substance that appeared to be Marijuana was found in one of the side pockets. The substance was tested using a REAGENT test kit and tested positive for the presence of marijuana.

18. The Defendant told CBP officers that he had planned to stay overnight in New York before traveling to Washington. However, the Defendant claimed that he did not know where he was going to stay and denied having any plans to meet with anyone except his friends with whom he had traveled from Jamaica.

19. While the Defendant was located at the facility, and within one hour of the arrival of the Defendant's flight at JFK, the DEVICE began ringing repeatedly. The DEVICE rang multiple times in short succession. For a number of the calls, the saved name corresponding with the number appeared on the DEVICE's screen, indicating that the Defendant had saved the caller's number in his contacts.

20. Based on my training and experience, I know that narcotics couriers often communicate with co-conspirators by phone, including through voice and messaging applications. Based on my training and experience, I know that narcotics couriers often receive instructions from co-conspirators by phone regarding where to go and what to do upon arriving in the United States. Further, based on my training and experience, I know that narcotics

couriers are often contacted by co-conspirators shortly after the couriers arrive in the United States, in an effort to locate and collect the narcotics the couriers have in their possession.

21. Based on the foregoing, there is probable cause to believe that there is evidence of the Subject Crimes on the DEVICE.

22. The DEVICE is currently in the lawful possession of HSI within the Eastern District of New York. It came into HSI's possession when it was seized incident to arrest, as set forth in detail above. The Defendant has provided HSI with both (1) the consent to search the phone and (2) the password to access the phone. The DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICE first came into the possession of HSI.

### TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

6

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets,

8

and presentations. PDAs may also include GPS technology for determining the location of the device.

 f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

 g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and research, I know that the DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the DEVICE.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed

via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the DEVICE described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*[signature]*

Matthew Rizzo
Special Agent
Department of Homeland Security, Homeland Security Investigations

Subscribed and sworn to before me by telephone
on June __4__, 2021

/s Roanne L. Mann
HON. ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

The property to be searched is the following device:

a. A red Apple iPhone 11 wireless telephone (the "DEVICE"). The DEVICE is currently in my possession within the Eastern District of New York.

## ATTACHMENT B

All information or records on the DEVICE described in Attachment A that relate to violations of Title 21, United States Code, Sections 952(a) and 960(a)(1) (importation of controlled substances), Title 21, United States Code, Section 963 (conspiracy to import controlled substances), Title 21, United States Code, Section 841(a)(1) (distribution and possession with intent to distribute controlled substances) and Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Subject Crimes") and involve Elijah Jamir Davis (the "Defendant") since June 1, 2020, including:

a. Lists of co-conspirators and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. information related to sources or intended recipients of drugs (including names, addresses, phone numbers, or any other identifying information);

d. information recording the Defendant's schedule or travel from June 1, 2020, to the present;

e. bank records, checks, credit card bills, account information, and other financial records;

f. evidence of user attribution showing who used or owned the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.